Lewis B. Levin v. Commissioner.
Levin v. Commissioner
Docket No. 109624.
United States Tax Court
1943 Tax Ct. Memo LEXIS 480; 1 T.C.M. (CCH) 522; T.C.M. (RIA) 43052; January 30, 1943
*480 Nathan Spivock, C.P.A., 582 Market St., San Francisco, Calif., for the petitioner. Harry R. Morrow, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: This proceeding involves a deficiency in income tax for the year 1939 in the amount of $90.90. Petitioner claims that an overpayment in tax has been made. In the petition it is alleged that respondent erred in determining: (a) that a loss sustained by petitioner in connection with a real estate transaction constituted a capital loss, deductible only in part, instead of an ordinary loss as claimed in the return. The claim for overpayment is bottomed on the contention, raised for the first time in the petition, and that (b) income for 1939 was overstated by reason of the fact that the proceeds derived from the sale of two crops of rice, raised in 1937 and 1938 but not sold until 1939, were erroneously included in toto in gross income but should have been included only in part since they were derived from the sale of a capital asset. Findings of Fact Petitioner, an individual, resides in San Francisco, California, and has an office at 333 Montgomery Street in said city. His return for the *481 calendar year 1939, on the cash basis, was filed with the collector of internal revenue for the first district of California. During the taxable year and from 1934 to the date of the hearing, petitioner was an insurance broker. Although he did not hold a real estate broker's license, he worked as a real estate salesman with the firm of Milton Meyer & Co., and specialized in handling leases. Prior to 1937 petitioner bought thirteen parcels of real estate, including apartment houses in San Francisco. His purpose in purchasing them was to dispose of them as soon as possible at a price which would yield a profit. Ten were sold after being held for an average of approximately six months each. Pending disposition petitioner managed the properties and collected the rents therefrom. On or about July 1, 1937, petitioner, Samuel Hamburger and Lester G. Loupe & Co. entered into a contract to purchase 866 acres of rice land in Sutter County, California. Petitioner and Hamburger each had a 25 percent interest in the contract - $2,000 being paid for or on behalf of each of them - and the Loupe Co. had a 50 percent interest. Said contract reads in part as follows: 2. The total purchase price *482 shall be the sum of FORTY THOUSAND and no/100ths ($40,000) Dollars, towards which $10,000.00, receipt whereof is hereby acknowledged, has been paid, and the balance of which the Buyer agrees to pay the Seller, as follows: 5,000 Dollars on or before the 1st day of November, 1938 5,000 Dollars on the 1st day of November, 1939 20,000 Dollars on the 1st day of November, 1940 Said deferred installments of the purchase price shall bear interest from date at the rate of 6 per cent per annum, payable semi-annually on April 15th and October 15th of each year except final interest payment, which will be made when and as final installment payment is made for the land. All other moneys, including delinquent interest, which becomes payable from Buyer to Seller under the terms hereof, shall bear interest at the same rate, which interest shall be payable whenever the principal is payable on which said interest is computed. Buyer may pay any sum before any specified date of payment. All payments, except as herein specifically provided, shall be made in lawful money of the United States of America. 3. Buyer shall have possession and use of said lands from date hereof, and shall continue in the *483 enjoyment thereof unless and until Buyer shall forfeit as herein provided, his right to complete the purchase thereof or his right to possession as herein otherwise provided. If Buyer shall fail or refuse at any time to perform, when and as due, any act or thing required of Buyer by the terms hereof, or shall breach any term of this agreement, then, at the election or option of Seller, all rights of Buyer, as given by the terms of this agreement, shall cease and terminate, and Buyer shall then forfeit all right to continue under this agreement and to perform the terms hereof, and to have possession of said premises or any part thereof, and Buyer then shall forfeit and be foreclosed of all rights hereunder both at law and in equity, and Seller shall be relieved and released of all obligations hereunder, either at law or in equity. Said election or the exercise of said option may be had by Seller by entry into possession, by written notice by letter to Buyer under paragraph nineteen, by commencement of suit to establish foreclosure or forfeiture or to foreclose this contract, or by recordation of such notice in the Recorder's Office of the County within which said property is situated. *484 Upon forfeiture, or loss of right to possession, or termination of this contract, without demand or notice, Seller shall have an immediate right of entry, and right of possession, and the right to oust all persons on said lands including anyone claiming under Buyer, and Buyer shall surrender possession to Seller; and thereafter Seller shall occupy, possess, enjoy and be seized in fee of said property and every part thereof as of its original estate herein. * * *
22. Said Buyer agrees to pay, when due and payable, all charges of Garden Highway Mutual Water Company for water furnished to said Buyer or used upon said land during the term of this agreement, and also to pay on demand all assessments levied upon and against the capital stock of said water company, and all other charges which said water company calls, makes or demands upon its stockholders to pay, proportionately to the number of issued and outstanding shares of capital stock of said water company to which the Buyer shall be or is hereafter entitled, or proportionately to the acreage of said land, as the case may be. Upon execution and delivery of deed to Buyer, as herein provided, Seller shall also cause to be issued *485 and delivered to Buyer certificate for 725 fully paid up shares of the capital stock of said Garden Highway Water Company. 23. The words "Buyer," "he," and "his," shall be deemed to include all the Buyers, if there be more than one. The contract was signed by Louis Lester, president, and L. G. Loupe, secretary, of the Louis Lester Company, as seller, and L. Harris, buyer. Harris was a "straw man" or "dummy" for petitioner, Hamburger and Lester G. Loupe & Co. On July 1, 1937, L. Harris executed an assignment reading as follows: For valuable considerations and the sum of One Dollar ($1.00) receipt of which is hereby acknowledged, I hereby assign all my right, title and interest in and to that certain Agreement of Sale entered into this 1st day of July, 1937, between The Louis Lester Company and myself for purchase of real property * * * filed for record in the office of the County Recorder of Sutter County, California, January 11, 1911, and recorded in Book 2 of Surveys at Page 16, to Lewis B. Levin. Petitioner paid the net down payment of $8,000, of which 25 percent or $2,000 represented his share. Petitioner knew nothing about farming and did not do anything personally with respect *486 to the management or operation of the property. Hamburger, one of the purchasers, was a real estate man who had been in the real estate business for 29 or 30 years. He and Loupe managed the property and petitioner's interest therein. During 1938 petitioner paid to Hamburger $2,190.58 as water assessments, taxes and other expenses in connection with the rice land. This amount was deducted by him from his rental income from other property and is not in issue herein. When the contract to purchase was executed the land was already planted in rice. The purchasers continued the cultivation of the rice through the tenant. The rice was harvested in October, 1937, and was offered for sale shortly thereafter. Efforts to sell were only partially successful for the reason that there was little demand for rice. The rice was then put in a warehouse. In May, 1938, the land was again placed under cultivation for rice by a tenant, secured for petitioner and his associates by Hamburger. The crop for 1938 was harvested in October of 1938, and it also was placed in a warehouse. The amount of rice placed in storage in each of the years is not shown by the record. No rice was planted in 1939 because *487 petitioner and his associates had been unable to sell the rice already harvested, the market for rice was poor, and no tenant was found willing to undertake planting, cultivating and tending it. Shortly after September 1, 1939, the price of rice rose due to an extraordinary event, namely the starting of war in Europe. About December 11, 1939, some six months after the property had been given up as hereinafter related, the rice in the warehouse was sold. Petitioner's share of the net proceeds, aggregating $7,244.26 after deducting taxes of $127.40 and other expenses of $265.01 was included by him in his gross income from rents. Efforts were made by petitioner and his associates to sell the land in 1937 and 1938 but no sale was made. It was held for sale at $50,000. Throughout 1939 Hamburger was trying to get a price that would enable them to recover their down payment. Rice land became more or less of a "drug on the market," due primarily to the fact that the market for rice was much less than the available stocks. The equity of petitioner and his associates in the land had become practically worthless. This was brought about in part by the condition of the rice market, by floods *488 which had occurred where it was located, and by reason of the fact that no tenant could be secured who was willing to plant it to the crop for which it was best adapted. On or about June 2, 1939, Hamburger wrote the following letter to The Louis Lester Co.: As I advised you the other day, my partners and myself have agreed to give up the contract on the 866 acres in Sutter County. So that you may take immediate possession, as requested by you during our conversation, I am willing to sign a cancellation agreement on this property. As soon as you have this contract prepared, I will be glad to sign it in order to clear your records. On June 26, 1939, Harris and Hamburger as "buyers," with the knowledge and consent of petitioner, and The Louis Lester Co. as seller, signed a document entitled "Cancellation of Contract." It provides, inter alia: WHEREAS, Buyers acknowledge default in performance under the terms of that certain agreement made the 1st day of July, 1937, between The Louis Lester Company and L. Harris, relating to the sale and purchase of that certain real property, situated in the County of Sutter, State of California, and particularly described as follows: NOW, *489 THEREFORE, in accordance with the terms relating to default in the said contract, the Buyers do hereby acknowledge that all rights of the Buyers under the terms of the said agreement have ceased and terminated and that Buyers have forfeited all right to continue under the said agreement and to perform the terms thereof and to have possession of said premises or any part thereof and are foreclosed of all rights thereunder, both at law or in equity, and that the Seller has been relieved and released of all obligations under the said contract, either at law or in equity, and that the Seller shall retain all monies and other things paid under the said contract by Buyers, as compensation for the use and enjoyment of the said premises and for the privileges and benefits therein extended to Buyers and for all trouble and expense to which Seller has been put by reason of the said transaction, and the said Buyers do hereby relinquish all right, title and interest in and to said described property, and Seven Hundred and twenty-five (725) shares of the capital stock of Garden Highway Mutual Water Company appurtenant thereto and do ratify and confirm possession of the said property by the Seller *490 and/or its lessees, grantees or assigns and the said Seller does hereby release the said Buyers from any and all payments which have not been made in accordance with the terms of the aforesaid contract. The contract of purchase, signed by Harris as "straw man" for petitioner and his associates, provided that the buyer should be entitled to a deed to the property after the payment of the first installment of $10,000, upon delivery to the seller of a promissory note for the balance of the purchase price, secured by a deed of trust on the property. The receipt of $10,000 is acknowledged by the contract; but no deed was ever requested or delivered and no note or deed of trust was executed. At the time the cancellation agreement was executed petitioner and his associates had not received any bill for water or water rights. The charge for water, if not used, was 25 cents (or 50 cents (?)) per acre for the season. If water was used, an additional amount was charged "according to the amount of water that was used." No amount was paid by petitioner and his associates for water in 1939; but the precise amount due at the time the cancellation agreement was signed, if any, cannot be determined *491 upon the record. Opinion The first issue is dependent upon whether the facts are analogous to those in such cases as W. W. Hoffman, 40 B.T.A. 459, affd., Commissioner v. Hoffman, 117 Fed. (2d) 987; Warner G. Baird, 42 B.T.A. 970; Bert B. Burnquist, 44 B.T.A. 484; and James B. Lapsley, 44 B.T.A. 1105, or whether they are more like those in such cases as Betty Rogers, 37 B.T.A. 897, affd., Rogers v. Commissioner, 103 Fed. (2d) 790, certiorari denied, 308 U.S. 580, rehearing denied, 308 U.S. 635; Pender v. Commissioner, 110 Fed. (2d) 477, certiorari denied, 310 U.S. 650; Gransden & Co. v. Commissioner, 117 Fed. (2d) 80; Kaufman v. Commissioner, 119 Fed. (2d) 901; and Commissioner v. Paulson, 123 Fed. (2d) 255. The distinction between the two groups, stated *492 generally, is: If an interest in real estate, having become worthless in the taxable year, is abandoned by the taxpayer, with or without the execution of a conveyance of the title, an ordinary loss is sustained; but if the taxpayer, through the execution of a conveyance of the title, is thereby enabled to secure release from a personal obligation, he had made a sale or exchange of a capital asset and his loss is subject to the limitations contained in section 117 of the applicable revenue acts. The case most nearly "on all fours" to the instant proceeding is Kaufman v. Commissioner, supra.In it the taxpayer had entered into two contracts for the purchase of real estate, one in his own name when the initial payment of $500 was made, and one in the name of a corporation, all of the stock of which was owned by him, which had apparently acted as a "dummy" for him when the final contract was signed. In 1936 the taxpayer surrendered the contracts for cancellation and the vendor released him from his obligation to pay the balance of the purchase price, amounting to $4,500. The court applied the rationale of Rogers v. Commissioner, supra, *493 and held that the taxpayer had sustained a capital loss. Petitioner argues that the contract comes within the definition of a mortgage under California law and, upon default in the payments due under it, must be foreclosed; that no deficiency judgment could have been rendered against him, even if he had signed the original contract; and that therefore his release was an idle gesture. Respondent points out that under California law, as construed by its courts, the remedies available to a vendor, upon default under a contract of purchase such as the one in evidence here, include, in addition to foreclosure, a suit for the installments due, a suit for damages for breach of the contract, an action for specific performance or one to quiet title. Caspar Lumber Co. v. Stowell, 98 Pac. (2d) 744; Security First National Bank of Los Angeles v. Hauer, 117 Pac. (2d) 953. Under his own testimony petitioner could not very well contend that he was not a party to the contract, especially after having received a formal assignment from the "dummy" or "straw man". Cf. Weidner v. Ziegler, 23 Pac. (2d) 515. *494 We think it is clear, therefore, that petitioner's release from liability under the contract calls for the application of the rationale of the Rogers, Kaufman, and the other cases cited, supra. But our conclusion need not rest entirely upon the release of petitioner from the payment of the unpaid balance of the purchase price due under the contract. It seems to be clear from the evidence that he and his associates were liable for some unpaid water charges, though the precise amount is not shown. Hamburger, under re-cross-examination, stated that the water charges "were very small if you didn't use the water." In answer to the question as to the amount per acre he stated: "If I remember right, I believe it was 25 cents an acre, if you didn't use the water, 25 or 50 cents, but I don't remember the exact amount." When asked whether the charges for water had been paid at the time the cancellation agreement was executed he replied: "I don't believe I paid the water at that time - I don't believe I received the bill that early for water charges." The cancellation agreement released the buyers "from any and all payments which have not been made in accordance with the terms" of *495 the contract. The contract required them to pay all water charges and assessments. (See Par. 22 of contract set out in our findings.) Therefore, regardless of the correctness of our conclusion as to the applicability of the cited cases because of petitioner's release from the payment of the purchase price, his release from the water charges and assessments clearly requires that respondent's determination be upheld. We therefore hold that the respondent committed no error in limiting petitioner's deduction, as provided by section 117 of the Internal Revenue Code. The remaining issue arises upon petitioner's claim for an overpayment. As stated at the outset, his contention is that his share of the crop, placed in a warehouse in the two years 1937 and 1938 and sold in 1939, constituted a capital asset as such term is defined by section 117 of the Internal Revenue Code. The statute defined capital assets as "property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade * * * or other property of a kind which would properly be included in the inventory * * * or property held by the taxpayer primarily for sale to customers in *496 the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation * * *." Petitioner recognizes that the proof has not been sufficient to justify us in granting him any relief from tax even if we should conclude that his basic theory is sound. Thus, upon brief, he suggests that we defer entering any final judgment "until testimony showing the amounts to which the taxpayer is entitled is introduced." No refers, of course, to the fact that there is no evidence from which we can determine the quantity of rice harvested in the years 1937 and 1938, the value of the quantities placed in the warehouse or the expenses of producing it. He admits that no effort was made to capitalize the receipts for the years 1937 and 1938; and, although at least the year 1938 is open, does not suggest that we attempt to recompute his tax for that year under E. B. Elliott Co., 45 B.T.A. 82. No formal motion for a rehearing, for a new trial or to reopen the proceeding has been made and no ruling upon his informal suggestion is required or proper. Under the circumstances we would probably *497 be justified in deciding the issue against him for failure to sustain his burden of proof. We will examine briefly, however, his contention that the rice was a capital asset. Petitioner argues that "the testimony shows that the tenant, and not the owners paid the expenses incurred in the growing of the rice. The expenses (water and perhaps taxes) that were deducted by petitioner were proper deductions." Testifying as a witness petitioner seemed to have only a vague idea as to what was done with the rice land and several questions were answered by stating that he did not have anything directly to do with the farm but relied exclusively upon Hamburger. Hamburger, when asked on direct examination who operated the property after July 1, 1937, replied: A. Myself and Mr. Loupe. Q. Who paid the expenses of operation? A. I did. Q. Did Mr. Levin pay you his share of the expenses or did you merely charge it to his account? A. Charged it to his account. Q. He did not actually give you cash? A. No, sir; charged it to his account. On cross-examination, when asked what was done in 1937 in connection with the cultivation of rice, Hamburger replied: A. We completed raising the crop of rice *498 and we harvested it, and there was no demand for it. Q. What expenses were incurred in cultivating the rice in 1937? A. The amount - the expenses were for water, irrigating. * * * * *
Q. What other expenses were incurred in 1937? A. Harvesting the crop, completing raising the crop, buying sacks, harvesting. In his return for 1938 petitioner deducted expenses aggregating almost $2,200 in connection with the rice crop for that year. Since he was the owner of a 25 per cent interest in the land and crop it is reasonable to assume that the total expenditure was approximately $8,300. It seems, therefore, that respondent is fully justified in contending that petitioner and his associates were engaged in the joint venture of raising rice and that the amount received was simply "issues and profits from the land of the same character as rents." From what has been said it is apparent we would not be justified in concluding that petitioner erred in reporting the amount in issue as ordinary income. We therefore approve the deficiency determined by the respondent. Decision will be entered for the respondent.